Good morning, Your Honor. May it please the court, my name is Dan Lloyd. On behalf of Appellant City of Vancouver, I will endeavor to reserve five minutes of my time for rebuttal. The district court abused its discretion by awarding an attorney fee that was 93% of the requested Lowe's star, even though the plaintiff received 1% of the amount she sought. In my time before the court, I will focus on two of the issues that we argued in our opening brief, unless of course the panel directs me otherwise. Let me ask you this, just to clarify this for me. She had six claims and she won on two, right? Won. Won. And that was against the city? Correct. Is there, it seemed a bit odd to me that, what was it, what, in terms of what was the argument of why the city was responsible but the chief wasn't? So you bring up a very good point, Judge Callahan. Well, I mean, I can't go behind the verdict, but what was the theory of that argument? What did the city do that wasn't argued that, because obviously, in a very prior life of mine, I represented the Civil Service Commission, and so I'm familiar with these rule of one, rule of three, rule of five, those type of things. And so it wasn't a challenge to that particular rule. It was that she, she didn't get, she was first three, and then she kept not getting promoted, and then she had a conversation, the chief said, well, you had an IA, and then she started sending letters to the city saying, if you don't promote me, I'm going to sue. And so what was the, what was the retaliation claim against that the city was involved with? Well, one way I can try to reconcile the verdict, exonerating Chief McElvain under the First Amendment, which required the same elements, a substantial motivating factor because of the retaliatory animus, Chief McElvain was exonerated on that, but finding retaliation against the city, is the plaintiff proposed a couple of cat's paw instructions, and that would be found during Instructions 23 and 26, that's pages 336 and 339 of the excerpts. We took exception to those instructions, we didn't think they were a proper statement of law, but nonetheless, we haven't appealed that. So that's the only way I can try to reconcile what the jury concluded. But the jury ultimately concluded only one employment decision. The very, the least valuable employment decision was retaliatory. And the jury completely rejected plaintiff's primary theme of the case, that there was this culture of gender discrimination within the Vancouver Police Department. That was front and center of plaintiff's case, and the jury said, no, you're wrong. But turning to one of the main reasons why the district court abused its discretion here, is that it impermissibly blended the two-step test from Hensley v. Eckerhart, and in so doing, rendered a decision that cannot be reconciled with McCown v. City of Fontana and McInnis v. Kentucky Fried Chicken, both published decisions of this court. McCown, as Judge Smith, I think, Your Honor, would know, you're the author of that opinion. The district court in that case wrote that these plaintiffs, in awarding those attorneys fees of $200,000 rather than the $300,000 rejected, said these attorneys aren't, have not provided that they are worth $400 and $550 an hour. That's the same decision that Judge Estadillo did here, said the fees, the hourly rate requested by Mr. Buschetto and Mr. Ellis are too high. So the district court acted well within its discretion by looking to its own decisions and saying these are the hourly rates. Well, did the district, what did the district court say? Was it too high because you should have gotten a better result, or what did the district court say there? It said two things. It said first, the district court said I'm not going to award $685 an hour and $575 an hour. What I'm going to do is exactly what Judge Estadillo did a few months earlier in Pena v. Clark County and award a rate that's within the range of all the decisions it had awarded previously. And that's striking because the Pena v. Clark County case, Judge Estadillo wrote in that decision, which is in Appendix B of our brief, that he emphasized this fee is appropriate because of, quote, the significant degree of success on the part of plaintiff's attorneys. That is the opposite of what happened here. The jury said no, you weren't discriminated against. The jury said no, you did commit misconduct and that justified Chief McElvain passing you over promotion in July of 2018. The jury said no, you were neither discriminated nor retaliated against when Chief McElvain passed you over again in October of 2018. And also, the jury rejected the claim that all of the internal affairs investigations that were into complaints of Sergeant Ballou's misconduct, that that constituted retaliation or discrimination. The jury rejected all of that and it rejected also the claim that the last promotional decision in January of 2019 was the result of gender discrimination. Gender discrimination was always the focal point of plaintiff's case and we know that from what they demanded in settlement. The very lowest demand, if it was even a demand, it was really an email from Mr. Buschetto to me saying, if you admit gender discrimination, if you unfound and undo the discipline and the findings of misconduct, and if you rewind Sergeant Ballou's seniority date to July of 2018, I think I can get Sergeant Ballou to accept $300,000 but also pay all attorney's fees up through November of 2023. Obviously, Sergeant Ballou attained none of that. There was no finding of discrimination. The jury rejected her claim that she acted in compliance with policy and the jury rejected the argument that her seniority date needed to be rewound as far as she wanted. Can I ask you this question? Yes, sir. I don't remember from the record there were settlement discussions that were rejected, far more generous than ultimately came out. I assume that the jury was unaware of any of these settlement discussions. Is that correct? Correct. Correct. There was an agreed order in Lemonade barring all evidence of settlement discussions under FRE 408. Excuse me. Correct. The thing on attorney's fees and having been a trial judge, as I know I have at least one to my left, when you hear a trial, what we all do is when we listen to it on a jury trial, in our own minds at the end of it, we think of it in terms of a bench trial, what we would do. And then when the verdict comes back, then we're sort of comparing our thoughts relative to the jury's thoughts. So a trial judge has a different perspective than people that sit up here on a high bench and just read stacks of papers and research the law to the nth. So there is some deference that goes to attorney's fees and the person that actually heard the trial and whether in their assessment of what's a good result, what is not a good result, what is, I think in here there was also a 33% that was added saying this is not, whether this is a high risk case or that type of thing. So the trial judge does have some perspective that we don't have and you both get the . . . and you argue that one way or another. So I'm always . . . I have that perspective in mind here, but I'm curious about . . . there were a couple of areas that the trial judge . . . I mean, you argue that the trial judge did not discount Ms. Ballou's limited success, but didn't the district court discount the attorney's fees by twenty to twenty-six percent in the Lodestar when accounting for the hourly rate? That happened? That happened, but again, Judge Estadillo selected a rate within the range of Western District, but then that . . . where I would go to that, Judge Callahan, is under Fox v. Vice, the Supreme Court says, yes, the district courts have wide discretion, but that . . . What does that mean? What was the court trying to say? The district court, you know, did not give the hundred percent because it . . . to reflect the likelihood of success at the outset weighed against Ballou's limited success at trial. So the court acknowledges that it's thinking about the limited success when it reduces the hourly rate. Right, but to that point, I would point the court to McCown because there, the district court did not accept the hourly rate claimed by those attorneys. The district court reduced the attorney fees by one-third . . . Do you have any case that tells us that we're supposed to look at those other decisions that are made by the district court? I'm sorry, say that again, Judge McCown. Do you have any case that tells us that we're supposed to look at the other cases decided by that judge? The other cases decided . . . I mean, you're referring to a reduction that was . . . or excuse me, a justification for a fee in another case, correct? Right, and that's the Kerr decision. But, well, excuse me, Kerr says the awards in similar cases must be compared. Right. But to answer the question that Judge Callahan raised, in McCown, what the court said that the district court properly answered no to this related, unrelated question. But it failed to properly analyze the award in light of the success. That comparison of the limited success must be to the amount of the award, not just the hourly rate. So in that sense, the district court fell short. And what the district court did here on page 11 of the excerpts, it repeated its analysis. It said the most critical . . . whether or not Judge Estudillo had a fulsome discussion of the subject. But the quote that Judge Callahan provided indicates that at least he considered it. He considered it on the front end. He failed to consider the degree of success on the back end, which is what McCown requires, is what Thorn v. El Segundo requires, that the limited success must be considered in light of the entire award. That is where the district court fell short. And what the district court said here was that it repeated its analysis. It said the court will not divide plaintiff's counsel's efforts, given that Ballou's successful and unsuccessful claims are sufficiently related. And I take it your position, and I think it's Johnson, I forget which the case is, but you've got the 12 factors. And I gather your position would be that the court basically did it again. It doubled down on the same analysis that had previously occurred. Is that right? It absolutely did, Your Honor. And that was talking about the multiplier. So on page 13 of the excerpts, it said the time and labor for counsel to prepare a factually complex case. That justified the multiplier. But it said two pages earlier that plaintiff had to build her factually complex case. And if there's a repetition of those factors, does that require reversal? Any repetition of just one under both Perdue v. Kenny A. and Cunningham v. City of Los Angeles. I see, Your Honor, I have a little over two minutes left. I'd like to reserve what time I have left for rebuttal, but I want to answer any questions the court has. Any further? I do have a question, so I'll still give you that amount of time. The purpose of a contingency adjustment to incentivize taking on cases where clients recover may be minimal. I thought it was to incentivize attorneys to take on cases where the risk of no recovery at all, if you look at FAM, and that under Washington law, attorneys can recover even when the client's damages award is minimal. So I'm struggling with the 33% that went up. What are we supposed to look at to decide? You could say this is a garden variety discrimination case, but there was some recovery. But what does it mean, a risk of no recovery? What does that mean? That's a risk in any contingency case. And to answer Your Honor's question, I will actually point to Judge Mendoza. When you decided a case on the Eastern District of Washington, it was Langley v. Geico Insurance. There was an RV fire that it was a first-party insurance claim actionable under the Consumer Protection Act, which has fee shifting, and the plaintiff recovered $621,000. And the court, interpreting Washington law, said while the results are adequate, they are not so exceptional as to warrant a multiplier. That's how Washington law is supposed to be applied, that the results must be exceptional. Otherwise, if that's the case, and the actual reasoning from Judge Estudillo here to justify the multiplier was that it furthered the public interest. Judge Estudillo wrote, this is warranted because plaintiff established, in at least one instance, retaliation at a publicly funded and public-facing agency. If that was enough to justify a multiplier, it would become the default rule in every Section 1983 case because the successful plaintiff must prove that the defendant acted under color of state law. Well, what if hypothetically the plaintiff had challenged the rule of three, and saying that having a rule of three is something that discriminates against women, and won on that. Would that be the type of case that you're challenging a civil service process that you're not likely to do it, but if you won, then that would have a huge effect, right? If you said you can't have a rule of three, it's always got to be a rule of one because a rule of three or a rule of five discriminates against women. I see the question, Judge Callahan, and I think you're on to something there because then that decision would impact every woman, or really every police officer who applied for promotion in that jurisdiction, moving all the way out. And if the case went up on appeal, it would be binding on all police departments within a given jurisdiction. So in that sense, there would be an absolute meaningful public benefit, and to quote McCown is that there is an obligation to reduce the attorney's fees if there is limited success and no meaningful public benefit. The only public benefit that the District Court found here is what I just articulated, is that the City of Vancouver is a government entity. Okay, thank you. I'll give you two minutes for rebuttal. Thank you. Good morning. Good morning. May it please the Court, Stephen Bruchetto to represent the plaintiff, Julie Ballew. I want to begin by just quoting something from the Supreme Court's decision in the Vice case, Fox v. Vice, where the Court said in one of its holdings, a trial court has wide discretion when, but only when, it calls the game by the right rules. Our position here is, and I'm going to talk about each of the How many claims did you prevail on? How many claims did we prevail on? We prevailed on one claim. Out of six. There were actually five. The judge concluded there were five legal theories and four adverse actions. We prevailed on one of the four and one of the five legal theories. As required by Judge Smith's decision in McCown, Judge Estudillo was aware of that rule, took it into account in making his decision. I know that the judge went back to Ballew 1, which included some of the hours in there. My understanding of Ballew 1 was where the chief had lost on qualified immunity. It went to the Ninth Circuit. The Ninth Circuit said, no, go to trial. Correct. And so it went to trial. That's really a collateral issue. I understand how all of the other claims you had to throw in the kitchen sink to have any understanding. They had to know everything. But qualified immunity, to me, seems like that's just a separate one, and I understand the argument of why that should be backed out. So can you respond to that? Sure. Thorne v. City of El Segundo was one of the cases the judge decided or relied upon, and I believe that Thorne disposes of that argument. In Thorne, it involved constitutional claims against individual police officers and a claim against the City of Fontana. In the procedure of the case, the case went up to the Ninth Circuit on qualified immunity alone. The Ninth Circuit ruled in favor of the officers. They were dismissed from the case, came back down, plaintiff won a sex discrimination claim against the city and awarded attorney's fees. Went up to the Ninth Circuit a second time. Ninth Circuit said that they reversed the attorney fee award because the judge had not considered whether the claims were related. But what's important is the Court said, the district court may reasonably conclude, pursuant to Hensley, that the Title VII claim in the Section 1983 claim arose out of a common core of facts and that evidence material to one claim was material to the other. This disposes of the question of whether a Ninth Circuit appeal on qualified immunity can be related to a Title VII claim. The judge relied upon it. He knew of it. He knew of the defendant's argument that McIlvain was somehow separate from the city. But in the lawsuit that you tried, Ballou was a prevailing party. I mean, not Ballou, Chief McIlvain or whatever, I don't know if I'm saying that correctly. McIlvain. McIlvain was a prevailing party, right, on his claim. He was, as were the individual officers in Thorne. All of the work of the individual officers the Ninth Circuit held could be reasonably a part of the Title VII claim if it's on a common core of facts and evidence material to one claim was material to the other. That is precisely the factual findings in this case. By the judge, the factual findings are not challenged on appeal. There's no argument that they're clear error. In our view, both ODIMA, which is another case involving multiple defendants and successful and unsuccessful claims, dispose of any argument as to whether or not the court could reasonably conclude that the Section 1983 claims were related to the Title VII claim. Can I shift you over slightly to the discussion I had with your friend? You may. As you know, the judge tended to repeat in the multiplier analysis things that he had previously considered. Under our case law, isn't that a reversible error? I don't believe that what the judge did constitutes repeating prior . . . Will you help me with that because . . .  I didn't count them exactly, but I thought like five different elements of . . . But he seemed to repeat them. What am I missing? Two things. Okay. With respect, directly with respect to your question, Washington law regarding multipliers looks at subjective factors at the beginning of the litigation and not at the objective factors. Okay? Objective factors would be like the specific time in litigating the case. And to help answer my question, I look at it in terms of subject, subject, subject, subject. And that's what I think happened here. He dealt this subject, that subject again. So help me with that, please. I don't believe Washington law says divides things by subjects. That's why I'm looking at it. I just want you to help me with what I'm missing. Sure. And I believe that what you're missing is that what's considered in setting the load star is the objective facts of what happened, how many hours were incurred. What's considered in setting the multiplier . . . But it's the hours that you can count. And anyway, go ahead. What's considered in determining the multiplier are the risks at the outset of the litigation. For example, there is in the Declaration of Ballou evidence that attorneys who are non-specialists would not take the case because it was too complicated, too much risk, required too much work. But isn't that all go to, yeah, you might not recover a lot, what you were asking, but I thought it was supposed to be for cases that, if you cite FAM, where there was a risk of no recovery at all. Well, there was a risk of no recovery at all in this case. I believe the reference in FAM is to whether there is a risk the attorneys will receive no compensation. Washington law requires essentially three things. Number one, it be a contingent fee agreement. Number two, the attorneys receive no compensation if they lose. I mean, in some of these circumstances, there will be retainer agreements that say, maybe we get a flat fee in addition to a contingency. Or maybe if we lose, we get a certain amount of money. In this case, there was a risk of no recovery at all for the attorneys. But it gets down ultimately, you had an attorney fee award of over $600,000.  For an award to your client of $11,000. It almost shocks the conscience, doesn't it? I mean, you're a good lawyer. I hope you make a lot of money. But I'm really struggling with how the juxtaposition between those two works. Well, Judge, the thing I would say is, and we rely to a great extent on your opinion in McCown. In your opinion in McCown, you say you compare damages, or you should compare damages with the amount awarded with the amount sought. You also say where there's no other relief. I mean, those are part of your words. No, I understand that. Yes. Great words, by the way. And in this case, Judge Estudillo was extremely careful. If you look carefully at his opinion, what he focused on in making the 10 percent reduction in the load start, he focused on not only the tangible benefits to Ballou, but the intangible benefits. And I credit the concept of lowering the hourly rate. I get that. But it's the quantum of the whole thing. Let me get there. Okay. Go ahead. You know, it's not only the fact that there were intangible benefits, equitable relief. It's also a finding of a public benefit. Well, it's the elephant in the room, is I think what you're talking about, when you're looking at those numbers. And it just struck me as bizarre that the police chief is the prevailing party on his claims. And then I didn't really see what was your argument that the city was somehow, what did they do extra on retaliation that the chief didn't do? Because it really all comes out of what the chief did. It seems like if you're saying that it's all one and the same, that the cat's paw is what he's saying. You're correct. You're absolutely correct. That supports us, not them. It supports us. Tell me how it supports you. Because all the decisions were made by the chief. The city is responsible for retaliation because all the decisions were made by the chief. But the jury said what the chief did was okay. The jury didn't say what the chief did was okay. The jury said that it did not. You didn't discriminate. You didn't retaliate. It did not hold him liable for discrimination. And under Section 1983, that can be reconciled with the verdict against the city because it requires specific discriminatory animus by the chief. It is plausible that the jury, what the jury concluded, is that there was a sexually discriminatory retaliatory culture at VPD and that that influenced the retaliation decision and that the chief knew about it and didn't do anything about it. A jury could conclude that's not enough for Section 1983 liability, but it's enough for Title VII liability. Well, and I'm not so sure that we at the Court of Appeals should be looking at all the different reasons, possible reasons that a jury reached that decision. But I want you to answer Judge Smith's question, which is the shocking nature in the amounts here. Well, again, I believe the judge's findings, the judge carefully looked at the case law and applied the rules. The judge found it was a low-damages case. The judge found it provided a public benefit. The judge found it provided intangible benefits to Ballew. And the judge found that the amount was reasonable. Was the benefit to the public that when you have a low-damage case that the city is going to have to pay hundreds of thousands of attorney fees? Is that the benefit? The benefit to the public is exact. So then the city is going to quake in its boots, even if someone is claiming not very much in damages, but you're going to get it later. The benefit to the public is exactly what the judge said. The verdict shed light on unlawful practices of the city, and that's important to the public. I also commend, as an indirect answer to your question, for the Court to look at the differing decisions on the motion to retax costs and the motion to award attorney's fees. Plaintiff argued very strongly that on the motion to retax costs, the judge should be looking at the public benefit, the intangible benefits to women in the workplace as well as Ballew. The judge said, eh, that's just not what the law provides. He discounted the 700 hours of work under FRCP 68. That decision is not appealed. He handled the attorney fee claim differently. He found public benefit, he found intangible benefits to Ballew, he found it important that there was a finding of retaliation by the city. I don't think any of that is . . . He followed the correct rules under Fox v. Vice, and he's entitled to a wide degree of discretion in terms of the importance of those. He's the one who listened to that evidence. He's the one who heard the women in the police force of the Vancouver PD talking about a history of discrimination and retaliation against them. He's the one who heard two commanders in VPD talk about McIlvain bargaining with them for a promotion for Ballew in exchange for dismissing their retaliation complaints. He's the one who heard them testify that McIlvain changed his approach and issued the first statement in VPD history from the chief saying, I won't tolerate sexist conduct after that meeting. That's important stuff. It's very important stuff. And that's why, in answer to your question, Judge Mendoza, that's why it's important that he's got a view of this case that this court doesn't. Is there a cap? Could the judge have doubled the attorney fee award in this case based on the same criteria that you've just articulated? A million dollars. Is there a cap? There is no case that sets any cap. You know, the judge has to make a reasonable decision, and that, of course, is where applying the rules of the game correctly come into play. Here, the judge said he looked at the results obtained, looked at the public benefit, and concluded that a one-third enhancement of the Lodestar was appropriate. I think that that is – I mean, I understand your point about – But I guess it's like, okay, on the one hand, you didn't get as much attorneys by the hour because you only got a minimal success, but then on the other hand, we're having – But it was a huge success, so I'm going to give you a third more. I don't think that he said – I mean, if you take a look at his words, in determining the multiplier, he said minimal success. He didn't construe it as an outstanding success. He was aware of that. But what he found important was counsel, the need to encourage counsel to accept these cases. Bellew presented evidence. She talked to ten lawyers. Nobody but current counsel would do a contingent fee for her. She didn't have the money to pay for a lawyer. He focused on Fox versus Vice with the important congressional purposes of vindicating these civil rights, and he found a public benefit. I don't think that that exercise of discretion, when he follows the rules, can be set aside. It's not a question of whether this court should decide on a different amount. It's a question of whether he abused his discretion and his findings are correct. Thank you, Judge. Thank you. Thank you, Your Honor. May it please the Court. First, as to Mr. Brichetto's statement that this was a low-damages case from the outset, he demanded $1.2 million on behalf of his client. This was never a low-damages case in their eyes because they sought $1.2 million, in addition to essentially the defendant falling on the grenade and saying, we discriminated against you. What about his argument of this is part of the reason this went up on the multiplier is this public benefit? What about that and that the judge considered that as he made that decision? First, I've addressed all that Judge Estivio said about the public benefit. Now, Mr. Brichetto referenced this April 2019 meeting in which the culture changed and Chief McElvain started treating women better. First, the jury rejected the claim that women were treated worse in the first instance, and second, I would actually direct the Court to page 212 of the excerpts. This is the declaration of Julie Ballew, where she writes that she has testified about how bad it is at Vancouver Police Department all the way through trial, and her words, it's not fair for me or other women to work under these conditions. So for him to say that the conditions of the Vancouver Police Department after this April 2019 meeting improved so much for women, that goes against what his client says. In fact, what the women who testified said was that there was never a problem with discrimination. That's the testimony of Sergeant Danielle Wass, the testimony of Sergeant Barbara Kipp, the testimony of Deanna Watkins. All of them testified there was never a problem with gender discrimination. So no, there was no change after this April 2019 meeting. And to that point, too, Judge Mendoza, is plaintiffs ostensibly prevailed on the theory that by filing the lawsuit on January 3, 2019, that's what led to Julie Ballew being denied a promotion that same month. Now, we argued against that. We put on evidence saying that Chief McElvain had no idea the lawsuit was filed, but Judge Estadillo sent that issue to the trial. And to your point, it would be difficult, if not impossible, for this Court to dive behind the verdict. But their argument, what they submitted to the jury under the First Amendment claim, under the Title VII claim, under the WLAD claim, was that filing the lawsuit cost her a promotion. So for her to say that filing the lawsuit was why I got promoted, it self-contradicts. And in that sense, this order, I would agree with Mr. Bichetto that it is necessary to read the order, because under Camacho v. Bridgeport Financial, the Ninth Circuit reviews the district court's own reasoning, not after-the-fact rationalizations by counsel. And regardless of the after-the-fact rationalizations today, this order cannot be upheld and be consistent with McCown. Unless the Court has further questions, I thank the Court for its time. No further questions, Aviva. Thank you both parties for your argument. This matter will stand submitted. And I believe this Court is in recess for the week. Is that correct? I'm correct, because we're not coming back tomorrow. So if it is not in recess, we won't be there. We're adjourned. Thank you.
judges: CALLAHAN, SMITH, MENDOZA